ABRAM C. WRIGHT, PLAINTIFF IN ERROR, V. THE STATE OF NEBRASKA, DEFENDANT IN ERROR.

**Evidence Held Insufficient.** The evidence examined and held not sufficient to support a verdict of guilty of the crime of burglary.

ERROR to the district court for Gosper county. Tried below before GASLIN, J.

*James M. Hamilton,* for plaintiff in error.

*William Leese, Attorney General,* for state.

REESE, J.

An information was filed by the district attorney of the eighth judicial district in the district court of Gosper county, charging plaintiff in error with the crime of burglary and larceny.

The trial resulted in a verdict of guilty of burglary, whereupon he was sentenced to the penitentiary for the term of one year.

The principal error now alleged is that the verdict of the jury was not sustained by sufficient evidence.

The crimes charged are, that of breaking and entering a dwelling-house, and stealing therefrom a quantity of meat alleged to be of the value of forty dollars. The verdict of the jury fixed the value of the meat taken at six dollars.

The house broken into was a dwelling-house, used in part
for a temporary school-house and was not occupied on the
night of the alleged breaking.   The fact of the burglary
was not known until the next day in the forenoon.   The
evidence was circumstantial.   On the part of the state it
was shown that the last person at the house on the after-
noon before the burglary (January 10, 1884) left the prem-
ises about sun-down, and returned the next morning about
sun-up, when the evidences of the crime were discovered.
On that day tracks of horses were discovered about the
stabling on the premises.   These tracks were followed about
three-fourths of a mile in the direction of the residence of
plaintiff in error, which was about two and a half miles
from the place where the crime was committed.   The
tracks showed evidence of having been made on the night
of the 10th, having been made when the ground was frozen,
and the road being muddy during the day of the 10th.
During the afternoon of the 11th horse tracks were fol-
lowed to the residence of plaintiff in error.   But it was
not shown that these tracks were followed continuously
through the whole distance.   One of the state's witnesses,
Ellwood Thomas, testified that they followed the tracks to
a cross-road running east and west, "and as cattle had
been running over there so much we could not follow the
tracks from there on for about one hundred rods; there we
saw some pony tracks again on the road," and followed
them to the residence of plaintiff in error.   It seems that
no comparison was made between the two sets of tracks by
measurement or otherwise for the purpose of determining
whether they were made by the same horses or not.   While
it was entirely competent for the state to present these facts
as circumstances tending to prove, in some degree, the guilt
of plaintiff in error, yet much of their force is destroyed
by the want of proof of their identity.   One of the wit-
nesses testified that he measured the tracks, but whether
those first followed, or those discovered after the trail had

32

been lost in the cattle tracks, does not appear, and that three or four days thereafter he applied his measuring stick to a track made by one of plaintiff's horses and they were the same size. If this measurement was made first of the tracks at the place of the commission of the crime and applied to the tracks of plaintiff's horses, the conviction produced thereby upon the mind would necessarily be much stronger than if the first measurement had been made of the tracks discovered after passing where the cattle had been.' This matter is left unexplained by the proof.

On the evening of the 11th, after or about dark, plaintiff in error was arrested and taken to Homerville, where he gave bail and returned home at night. Some of the witnesses followed him home, and remained about his premises during the night, for the purpose of watching him. He and they arrived at his house about eleven o'clock, but he had no knowledge of their presence. About an hour after that time he came out of the house, went to his stable, and soon after returned with a stick of wood, or timber, on his shoulder, which he cut up for use, and carried it into the house. Afterwards he came out again and went to the well and seemed to be drawing water. This was repeated two or three times in succession, his wife accompanying him the last time. Each time he carried something which appeared about the size of a waterbucket. He then saw the watchers and informed them they could remain there as long as they desired, but that he should go in and go to bed. The next day, in the afternoon, the premises were searched, and about 100 to 150 pounds of meat was found in the well referred to, and taken possession of by the officer, and taken to Homerville. The property was not identified by the person from whom the meat was stolen as his; yet he testified that it resembled his in two or three particulars, which he described.

These facts constituted quite a strong array of circumstances, and if unexplained would perhaps be sufficient

to sustain a conviction. But when the testimony on the part of plaintiff in error was presented, it seems to us to have been quite sufficient to so far destroy the force of the circumstances proven as to create very serious doubts in the minds of an impartial tribunal as to plaintiff's guilt. Mr. King, the owner of the stolen property, testified that from 300 to 350 pounds of meat was stolen, but only 100 to 150 pounds was found in the well. It would seem probable that if plaintiff had stolen the 350 pounds, the whole of it could have been found. It was shown on the cross-examination of plaintiff that when his premises were searched a quantity of meat was found in his house; but it was not disturbed, and it seems to have been conceded that it belonged to him. As to the conduct of plaintiff on the night of his arrest, he testified that his horses became untied during the night, and that he caught them at the well by drawing water into the trough and catching them when they came to drink. He also testified that one of the persons engaged in watching the premises assisted in catching the horses, and that occasion was the only time he was at the well. This was not contradicted by the state, although the witnesses were present who knew of the facts. The well in which the meat was found was upon adjoining land, about ninety steps from plaintiff's house, and was used but little by him, except for stock water. Plaintiff and his wife both testified that plaintiff was at home all of the night on which the crime was committed, and that they knew nothing of the meat being in the well until it was found. Plaintiff also, in the most positive terms, denied any knowledge of the commission of the crime. He also testified that but one of his horses was broken to ride, and that he passed over the ground where the tracks near his house were discovered on the evening before the burglary, with some wild ponies, on his way home from town. William Gath testified that he measured the tracks followed by the witnesses Burke and Thomas, and also the feet of

Wright's horses, and that their feet were one quarter of an inch larger than the tracks, and that the horse that made part of the tracks "overreached," while plaintiff's horses did not; also that one of the hoofs of plaintiff's horse was badly broken out on one side, while the tracks followed were made with unbroken hoofs.

It seems to us, upon the whole case, that the verdict of guilty of burglary was not sustained by the testimony. Every criminative circumstance was either explained or denied in such a manner as to render plaintiff's guilt extremely doubtful, and the motion for a new trial should have been sustained on that ground.

The judgment of the district court is therefore reversed, the motion for a new trial sustained, and the cause remanded for further proceedings in accordance with law.

REVERSED AND REMANDED.

THE other judges concur.